**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| BERNADETTE BURNS | : |
| 131 Fern Road | : CIVIL TRIAL DIVISION |
| Southampton, PA 18966 | : |
| Plaintiff, | : JURY TRIAL DEMANDED |
| | |
| vs. | : NO. |
| | |
| USI INSURANCE SERVICES, LLC | : |
| 1787 Sentry Parkway West | : |
| VEVA 16, Suite 300 | : |
| Blue Bell, PA 19422 | : |
| Defendant | : |

## CIVIL ACTION COMPLAINT

### PARTIES

1.  Plaintiff, Bernadette Burns ("Burns"), is an adult individual residing at 131 Fern Road, Southampton, PA 18966.

2.  Defendant, USI Insurance Services, LLC ("USI"), is a limited liability company or other entity that maintains a registered office and/or principal, regular or usual place of business at 1787 Sentry Parkway West, VEVA 16, Suite 300, Blue Bell, PA 19422.

### JURISDICTION

3.  This is a civil action arising under the laws of the United States and is brought pursuant to the American with Disabilities Act of 1990, as amended, 42 U.S.C. § 12101 et seq. ("ADA") and 42 U.S.C. §1981a.  This Court also has jurisdiction of the claims pursuant to 28 U.S.C. § 1331 and 28 U.S.C. §1343.

## VENUE

4.  Defendant transacts business and is found in this district.

## FACTUAL BACKGROUND

5.  Burns suffers from anxiety with panic attacks, a disability, which causes dizziness, lightheadedness, chest tightening, rapid heart rate, shortness of breath, difficulty with focus and concentration.

6.  Burns was employed by the defendant as a senior account executive.

7.  The sales executive to whom Burns was assigned for approximately the past 15 years was Mark Delany (Delaney).

8.  On or about November 30, 2017, USI acquired ACO Brokerage Holdings Corporation which owned all of the equity interest in Wells Fargo Insurance Services USA, LLC, the entity that issued Burns' pay checks prior to November 30, 2017.

9.  After November 30, 2017 Burns' paychecks were issued by USI Insurance Services, LLC.

10.  As Delany's senior account executive Burns ran Delany's book of business, performed contract review, handled renewals, performed presentations, was primary point of contact for all clients, serviced accounts and directed two account representatives.

11.  Burns was very good at her job.

12.  In fact, in order to entice Burns to remain an employee after the acquisition, Burns was offered a sizable retention bonus payable in two installments; one forty-five days after the first anniversary of the acquisition, which was paid; and a second much

larger payment, forty-five days after the fourth anniversary of the acquisition, which is due in early 2022.

13.  In or about April 2019, due to a significant increase in workload (resulting from the departure of two other account executives and a full-time placement/marketing account executive), and a refusal to provide Burns additional support to manage the increased workload, Burns attempted to submit a resignation letter to Delany.

14.  Delany refused to accept the resignation and instead told Burns to give it to Dimitri Deveraux, President of Mid-Atlantic Region Property & Casualty for USI (Deveraux).

15.  Deveraux also refused to accept the resignation letter and instead assured Burns that she would be provided additional help to handle the significant increase in workload.

16.  In or about the beginning of September 2019, Burns had a panic attack at work that was witnessed by Delany, Nick Tucci (claims consultant) and Ruth Cocco (account representative).

17.  After the panic attack Burns took an unscheduled day off from work to seek medical treatment for the panic attack.

18.  The unscheduled day off was very unusual for Burns and the first one she can recall taking in many years.

19.  Prior to the panic attack and unscheduled day off, Delany and USI were unaware of Burn's condition.

20.  At some point during September 2019, after the panic attack but prior to September 20, 2019, Burns had a meeting with Lisa Habermehl, Commercial Lines Manager, USI (Habermehl), wherein they discussed Burns' panic attack, the medical treatment Burns was receiving, and the increased stress and anxiety caused by the additional workload.

21.  After the meeting, Habermehl sent Burns an instant message telling Burns that everything would be okay.

22.  On the USI organizational chart, Habermehl was Burns' immediate supervisor.

23.  However, Burns only reported to Delany.

24.  On or about September 20, 2019, Habermehl came to Burns' office and told Burns that she was getting a six percent raise (which Burns already knew).

25.  Habermehl also told Burns that Burns wasn't going to be provided any additional help and that Burns would have to decide which of her two assistants to let go.

26.  Habermehl and USI knew that Burns had been asking for additional help for the past six months and that the increased stress had caused a significant increase in Burns' anxiety resulting in a panic attack at work requiring medical treatment.

27.  Nevertheless, Burns was now being told that she would have less help; and, that she would have to choose which of her assistants to let go.

28.  This news, predictably, caused such an increase in Burns' anxiety level that she was admitted to the hospital that evening.

29.  While being driven to the hospital Burns electronically submitted a resignation letter giving two weeks' notice.

30.  On or about September 23, 2019 Burns returned to the office to work and met with Delany.

31.  Delany told Burns that Habermehl did not have authority to tell Burns that she would be losing an assistant and, if fact, the opposite was true; that they were still planning to get Burns help.

32.  Delany then asked Burns if she would have given her two weeks' notice if she knew that she was going to be given additional help as opposed to losing one of her assistants.

33.  Burns told Delany that she would not have given her notice.

34.  Delany then told Burns that he had been in discussions with upper management all weekend and that they would not allow Burns to rescind the resignation given everything they know about her, referring to Burns' mental health issues.

35.  At all times material hereto USI was acting by and through its duly appointed employees, agents, servants and/or workmen who were acting within the course and scope of said agency and/or employment relationship with the express and/or implied permission of USI.

36.  Burns received a "Right to Sue" letter on or about August 6, 2020.  (*See,* letter from EEOC dated August 6, 2020 attached hereto as Exhibit "A.")

## COUNT - I
## PLAINTIFF v. DEFENDANT
## PLAINTIFF'S CLAIMS UNDER THE ADA

37.  Plaintiff hereby incorporates by reference all of the allegations contained in paragraphs 1 through 36 inclusive as fully as though the same were herein set forth at length.

38.  USI regarded Burns as having a disability withing the meaning of the ADA.

39.  USI failed to engage in the interactive process with Burns to properly evaluate her request for an accommodation.

40.  USI failed to provide Burns with a reasonable accommodation.

41.  Burns was capable of performing the essential functions of her position.

42.  USI's conduct, as outlined above, including, but not limited to, increasing her stress level by falsely telling Burns that she would not be getting any help and that she would be losing an assistant thereby precipitating a mental health crisis, refusing to allow Burns to rescind the resignation that she tendered on the way to the hospital during the mental health crisis, and/or informing Burns that USI would not allow her to rescind the resignation that she tendered on her way to the hospital during the mental health crisis constitutes unlawful disability discrimination in violation of the ADA.

43.  Further, USI's conduct in not allowing Burns, and/or informing Burns that they would not allow her, to rescind her resignation while she was still actively employed, constitutes unlawful discharge and/or constructive discharge in violation of the ADA.

44.  As a direct result of USI's unlawful and wrongful conduct, Burns has suffered substantial economic harm including, *inter alia*, lost wages, bonuses and benefits.

45.  In addition, USI's unlawful and wrongful conduct has caused Burns significant emotional distress.

46.  Further, said unlawful and wrongful conduct was willful, intentional, outrageous, and/or in flagrant disregard of the provisions of ADA thereby entitling Burns to punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, plaintiff seeks damages to the extent that she has been harmed by defendant's unlawful conduct and specifically prays that the Court grant the following relief:

A.  Enter an Order compelling the defendant to reinstate plaintiff to her former position with all accrued seniority and benefits so as to put plaintiff in the same position as though she was never discharged;

B.  Award to plaintiff back salary, wages, fringe benefits, front pay, and other allowable damages, together with prejudgment interest pursuant to the ADA;

C.  Award to plaintiff compensatory damages pursuant to the ADA;

D. Award to plaintiff punitive damages pursuant to the ADA;

E.  Award to plaintiff and her counsel attorney's fees, costs and disbursements pursuant to the ADA; and,

F.  Any other equitable or legal relief that this Court deems appropriate.

## **JURY DEMAND**

Plaintiff demands trial by jury of all issues so triable.

Respectfully Submitted,

By: /s/ Bruce Preissman
       Bruce Preissman
       I.D.# 69996
       1032 Mill Creek Drive, Suite 204
       Feasterville, PA  19053
       (215) 322-6990
       Attorney for Plaintiff